IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| JEFFERY TYLER LANE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-632 (AJT/IDD) |
| | ) | |
| ARMOR CORRECTIONAL HEALTHCARE, | ) | |
| INC., et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OPINION

Jeffery Tyler Lane ("Lane" or "Plaintiff"), a Virginia inmate proceeding *pro se*, filed a civil-rights suit under 42 U.S.C. § 1983, alleging that while he was detained at the Lunenburg Connectional Center ("Lunenburg"), Defendants Dr. Jesus Llanes, Dr. Jalal Taslimi, and Dr. William Henceroth, II, Armor Correctional Healthcare, Inc. ("Armor"), the former contracted medical provider at Lunenburg, and Harold W. Clarke, the Director of the Virginia of Department of Corrections ("VDOC") at the relevant time, were deliberately indifferent to his medical need in violation of his rights under the Eighth Amendment. [Doc. No. 1]. The complaint was screened, and Plaintiff was granted leave to file an amended complaint. [Doc. No. 6]. Plaintiff filed an amended complaint, raising the same claim, against three Defendants: Dr. Llanes, Dr. Taslimi, and Dr. Henceroth. [Doc. No. 11]. Plaintiff's claim concerns the medical treatment provided for his left knee, which was injured playing volleyball in 2019. [*Id.* at 4.] He seeks monetary relief and an order directing that his "knee [be] fixed." [*Id.* at 17.]

The matter is before the Court on motions for summary judgment filed by Dr. Llanes and Dr. Henceroth. [Doc. Nos. 35, 47, 49]. Plaintiff has been afforded the opportunity to file responsive

materials pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and he has done so. [Doc. Nos. 54, 56, 59]. Accordingly, this matter is now ripe for disposition. For the reasons that follow, each defendant's motion for summary judgment must be granted, and the claims against each defendant must be dismissed.[1]

## I. BACKGROUND

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants Henceroth and Llanes, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, have each set forth a statement of material facts that each defendant contends are undisputed. Plaintiff has not complied with his obligations under those Rules by submitting statements of undisputed and disputed facts, but he has submitted one sworn pleading in response to Defendant Henceroth's motion for summary judgment. [Doc. No. 56].

Accordingly, the following statement of uncontested facts is derived from a review of Defendants' statements of undisputed facts, and the summary judgment record.[2]

---

[1] On May 13, 2023, the Clerk sent Defendant Taslimi a Notice of Lawsuit and Request for Waiver of Service of Summons, which was returned as undeliverable on July 24, 2023. [Doc. Nos. 18, 23]. The Clerk issued a summons on August 8, 2023, which the United States Marshals Service ("USMS") returned unexecuted on September 11, 2023. [Doc. Nos. 27, 31]. Plaintiff provided a new address for Defendant Taslimi, [Doc. No. 29], and the Clerk sent a Notice of Lawsuit and Request for Waiver of Service of Summons on September 22, 2023. [Doc. No. 32]. On December 13, 2023, the Court issued a show cause order because Defendant Taslimi had not been served. [Doc. No. 52]. On January 17, 2024, Lane replied to the show cause order but did not provide an address, stating that he had no way of finding the defendant and asking for "help." [Doc. No. 58]. On June 3, 2024, the Court identified a possible address for Defendant Taslimi from another civil action and directed the Clerk to issue a summons. [Doc. No. 64]. On June 21, 2024, the summons was returned unexecuted, with a notation that the defendant contacted the USMS by phone and informed the USMS that he did not live in Virginia anymore and had moved to Miami, Florida but he did not provide an address. [Doc. No. 68]. Because service upon Defendant Taslimi has not been perfected, he will be dismissed without prejudice. *See* Fed. R. Civ. P. 4(m).

[2] The record of admissible evidence includes Defendants' affidavits and unobjected-to exhibits, [Doc. Nos. 36-1, 36-2, 48-1, 53-1, 53-2], and the Plaintiff's sworn response to Defendant Henceroth's motion for summary judgment, [Doc. Nos. 56, 56-1]. *See Goodman v. Diggs*, 986 F.3d 493, 498–99 (4th Cir. 2021) (quoting *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017)) (noting that verified pleadings are the "equivalent of an affidavit"). The Court will also refer to unobjected-to portions of the medical records submitted by Plaintiff. [Doc. Nos. 12, 17].

1.      Plaintiff was detained at Lunenburg at all times relevant to the allegations in his amended complaint. At all relevant times, Armor provided services at Lunenburg in Victoria, Virginia. [Doc. No. 36-1] ¶¶ 3, 7.

2.      Plaintiff had been scheduled to be seen by a medical provider on May 15, 2020, but was not seen that day due to a "modified lockdown." [Doc. No. 17] at 36. On May 28, 2020, Plaintiff, wearing a knee sleeve, saw Dr. Fontaine. Plaintiff told her that the Motrin had "helped [his] pain," and that the knee sleeve had also "helped." *Id.* at 39. Dr. Fontaine continued the Motrin and knee sleeve, told Plaintiff to try to lose weight, and that he could not be "sent out" at that time due to COVID-19. *Id.*

3.      Plaintiff saw a nurse on May 3, 2020, and complained about pain in his left leg, which he had injured playing volleyball several months before in 2019. [Doc. No. 17] at 35. The pain was behind his left knee, which had previously undergone surgery for a torn meniscus. He was prescribed Motrin and referred to a doctor for a possible x-ray. *Id.* On June 1, 2020, the x-rays of his left knee were "completed." *Id.* at 40.

4.      Dr. Fontaine saw Plaintiff on an unrelated matter on June 4, 2020, and provided him with the results from his x-rays at that time. *Id.* at 41. The radiologist's report found "[p]rogressive medial joint space narrowing and subchondral sclerosis. Tricompartmental osteophyte formation. Small effusion. No fracture or suspicious focal osseous lesion." *Id.* at 14.

5.      On July 8, 2020, Plaintiff was seen for his knee pain, and he indicated that his pain medication was "not working," and that his lower leg "hurt constantly." *Id.* at 42.

6.      On July 22, 2020, Plaintiff informed Dr. Fontaine that the pain medication was not working, and the knee sleeve "hurts." *Id.* at 43. She offered Plaintiff a cane (which he refused), discontinued Motrin, and started him on Mobic and capsaicin cream. *Id.*

3

### A. Dr. Henceroth

7.      Plaintiff was referred to and saw Dr. Henceroth on August 25, 2020. [Doc. No. 48-1] ¶ 7. Dr. Henceroth, an orthopedic consultant, saw patients referred to him by the physicians working at the Lunenburg facility. *Id.* ¶ 6. Dr. Henceroth reviewed Plaintiff's medical records and x-rays, diagnosed his injury as a sprain, administered an injection for pain relief, and ordered a follow-up appointment in several weeks. *Id.* ¶¶ 7-8.

8.      On September 21, 2020, Plaintiff saw Dr. Fontaine again and stated that his left knee still hurt despite being given a "cortisone shot." [Dk. No. 17] at 45.

9.      At his follow-up with Dr. Henceroth on October 15, 2020, Plaintiff again "complained of pain over the lateral aspect of the left knee." [Doc. No. 48-1] ¶ 9. Accordingly, Dr. Henceroth "recommended an MRI to look for a tear of the lateral meniscus (the piece of cartilage that serves as a cushion between the shinbone and thigh bone and helps stabilize the knee)" because "[a] torn meniscus is present in 90% of arthritic knees." *Id.* In his affidavit, Dr. Henceroth represents that Plaintiff's "complaints of pain were not urgent," which was typical of other orthopedic complaints. *Id.* ¶ 10. Dr. Fontaine, as Plaintiff's treating physician, forwarded Dr. Henceroth's MRI recommendation to Dr. Llanes. *See* [Doc. No. 36-2 at 2].

10.     Ultimately, Dr. Llanes denied the request for an MRI, citing the lack of "x-rays, consults, diagnosis or any pertinent medical information provided to assess medical necessity." [Doc. No. 36-1] ¶ 11.

11.     Notably, Dr. Llanes represents in his affidavit that in October 2020, at the height of the COVID-19 pandemic, Lunenburg suspended the transfer of inmate patients unless there was a medical emergency. *Id.* ¶ 12. Similarly, it was common for diagnostic centers to deny requests for non-urgent MRIs—if they were not closed entirely due to the lockdowns. *Id.*

4

12. Plaintiff saw Dr. Fontaine on October 21, 2020 at a follow-up appointment to discuss various issues, including his left knee. [Doc. No. 17 at 37]. Plaintiff told Dr. Fontaine that he "agreed to wait until after he goes up for parole to do the MRI [and that] [i]f he makes parole it will not be done." *Id.* Dr. Fontaine authorized a knee sleeve, which was issued to Plaintiff on October 27, 2020. *Id.*

13. Over the next few months, Plaintiff saw nurses several times for his knee pain. On December 27, 2020, a nurse evaluated Plaintiff for knee pain and indicated that he would be referred to an onsite doctor. *Id.* at 38. A nurse saw Plaintiff again on January 8, 2021. *Id.* at 33. Plaintiff had wanted to "discuss" an MRI for his knee but indicated that the Motrin had "really helped a lot." *Id.* Plaintiff also "[w]ondered if a cortisone shot would help him." *Id.* A nurse saw Plaintiff again on January 14, 2021 about his knee pain, increased his Motrin dosage, and told him that an MRI could be "consider[ed] … down the road when [COVID-19 is] under control." *Id.* at 34. On May 4, 2021, a nurse saw Plaintiff again for the pain in his left knee. *Id.* at 32. He told her that he was "trying to get [his knee] fixed before [he went] home." *Id.*

14. On May 28, 2021, Dr. Henceroth saw Lane for the first time since October 15, 2020. Lane again complained of posterolateral pain in his left knee and told Dr. Henceroth the pain-relief injection Lane received from Dr. Henceroth in August 2020 did not help. [Doc. No. 48-1 ¶ 15]. Dr. Henceroth examined Lane, who was 6'2" tall, weighed 295 pounds, and found he had a mild limp, mild effusion, posterolateral tenderness, his "approximate range of motion was 0 to 90 degrees and he exhibited" posterolateral "clicking." [*Id.*]. Dr. Henceroth reviewed prior x-rays, which showed "moderate to severe medial compartment arthritis," and based on his examination diagnosed Lane as having "moderate to severe compartment arthritis of the left knee, effusion, and obesity." [*Id.*]. Dr. Henceroth also recommended an MRI. [*Id.*]. On May 28, 2021, Dr. Llanes

approved the request for an MRI on Lane's left knee. [Doc. Nos. 12 at 2; 36-2 at 5]. A note in Lane's chart indicates that Dr. Henceroth had submitted a request to perform an MRI on Plaintiff's left knee for approval and that an MRI had been performed. [Doc. No. 17 at 30–31]. The consultation report for June 9, 2021 indicates the MRI had been completed and the "result [would] follow." [*Id.* at 12].

15.     A note dated June 23, 2021 in Plaintiff's chart indicates that Dr. Henceroth had reviewed the MRI, which showed a "lost [sic] of joint space [in the] medial compartment of the left knee with torn medial meniscus." [Doc. No. 12 at 7].[3] Dr. Henceroth submitted a request that Lane be evaluated for surgery by Ortho Virginia.[4] [*Id.*]. Dr. Llanes approved the request on June 23, 2021. [*Id.* at 4].

16.     A June 30, 2021 entry in Plaintiff's chart indicates "Motrin was helpful when [Plaintiff] takes it," and his Motrin prescription was renewed for "90 days." [Doc. No. 17 at 26].

17.     On July 9, 2021, Dr. Vince Dalton of Ortho Virginia reviewed the MRI of Lane's left knee with Lane; his notes indicated evidence of "medial meniscus tearing" and that Lane's left knee had "osteoarthritis." [Doc. No. 56-1 at 2]. Dr. Dalton told Lane that there were several treatment options, including Dr. Dalton's recommendation of a total knee replacement. [*Id.*]. The notes are as follows:

> The MRI shows advanced tricompartmental chondrosis. Most pronounced medially. Ligaments intact. Evidence of medial meniscus tearing. I also reviewed the x-ray of the left knee ordered today with the patient. The x-ray shows varus

---

[3] Lane asserts that Dr. Henceroth ignored the MRI results and "lied" when he averred that he had not seen the MRI results before April 11, 2022. [Doc. No. 56 at 3–4]. Lane's assertion appears to be based on Dr. Taslimi's June 23, 2021 request for a referral to Ortho Virginia. While the Court assumes for purposes of this motion that Dr. Henceroth reviewed the June 9, 2021 MRI results on June 17, 2021, and discussed those results with Lane, including the torn meniscus, *see* [Doc. No. 36-2 at 7], whether Dr. Henceroth knew about the torn meniscus prior to April 22, 2022 is not a material fact. Dr. Henceroth indicated that he intended to request that Ortho Virginia evaluate Lane, and in fact he made such a request on June 23, 2021, which Dr. Llanes approved on June 23, 2021. [Doc. No. 17 at 9–10]; [Doc. No. 36-1 ¶ 14].

[4] Ortho Virginia is an off-site medical provider that performs imaging (*e.g.*, MRIs) and orthopedic surgery.

deformity with medial joint space narrowing which is close to bone-on-bone. Osteoarthritic changes of the patellofemoral joint. I discussed the diagnosis of left knee osteoarthritis with the patient. I explained to the patient that he will ultimately require a left total knee replacement. I discussed treatment options including left total knee replacement vs left knee arthroscopy vs a partial knee replacement vs a repeat steroid injection to the left knee and the pros and cons of each. I explained to the patient a left knee arthroscopy would likely not provide him significant relief from his symptoms due to his underlying left knee osteoarthritis. I also explained to the patient that due to his young age (52 yo) and weight, there is a possibility he may wear out a left total knee replacement or left partial knee replacement. We discussed total knee replacement surgery at length including expected outcomes and post-op recovery as well as risks and complications, specifically DVT, PE, infection, and nerve injury. After a lengthy discussion, he desires to proceed with surgery. We will schedule surgery at his convenience. Follow-up for scheduled surgery.

[*Id.*].[5]

18.     The July 20, 2021 entry in Plaintiff's chart indicates that Ortho Virginia saw Plaintiff on July 9, 2021 and recommended a "total knee replacement." [Doc. No. 17 at 25]. The notes further indicate that the "surgery is on hold at this time due to COVID pandemic," and that it could be "schedule[d] when the hold is lifted." [*Id.*]. A note dated December 29, 2021, written after Plaintiff inquired about the status of his surgery, states, "will schedule when hold is released." [*Id.* at 21].

19.     After Plaintiff filed a complaint in December 2021 to request that his knee replacement surgery be scheduled, a nurse explained to him, "You were seen by Dr. Taslimi on 12/29/21 to discuss your knee surgery. You were advised at that time by Dr. Taslimi that elective surgeries are on hold at this time due to the ongoing COVID-19 pandemic & that when restrictions were lifted you would be scheduled." [Doc. No. 12 at 12].

---

[5] When all three components of the knee (the lateral femoral-tibial, medial femoral-tibial, and the patellofemoral compartments) "are affected [with osteoarthritis,] a patient is diagnosed with tricompartmental osteoarthritis." *See* Jessica Brown, *Tricompartmental Osteoarthritis in the Knee: What Is It?*, CREAKYJOINTS (July 12, 2019) https://creakyjoints.org/about-arthritis/osteoarthritis/oa-overview/tricompartmental-osteoarthritis-knee.

20.     An "Emergency Grievance" form indicates that Plaintiff saw a nurse on February 18, 2022 to inquire about treatment for knee pain. [*Id.* at 20].

21.     Dr. Henceroth saw Lane again on April 11, 2022. [Doc. No. 48-1 ¶ 17]. At that time, both of Lane's knees had mild effusions and 100-degree range of motion, and the left knee had medial osteophytes (bone spurs). [*Id.*]. Dr. Henceroth recommended x-rays of both knees, which "showed moderate osteoarthritis of the medial compartment on both knees, and no worsening or progression since the last images." [*Id.*]. Prior to that visit, Dr. Henceroth had reviewed Lane's knee imaging and concluded that, because "menisci tears are present in 90% of arthritic knees," Lane's medial meniscus tear was not causing his symptoms. [*Id.* ¶ 21.]

22.     The last time Dr. Henceroth saw Lane was at a follow-up appointment on May 11, 2022. [*Id.* ¶ 18]. At that time, Lane had a 115-degree range of motion and a "periarticular enlargement (a natural increase in joint size over time) compatible with osteoarthritis." [*Id.*]. Dr. Henceroth also noted that Lane "ambulated without difficulty." [*Id.*]. Dr. Henceroth recommended that Lane return in four months if his condition worsened. [*Id.*].

23.     In his affidavit, Dr. Henceroth opined that "[n]otwithstanding the hold on surgeries occasioned by the pandemic, … this surgery was (and, to the extent he has not yet had it, still is) an *elective* procedure for Mr. Lane." [Doc. 48-1 ¶ 22]. This was because "Mr. Lane needed to lose weight prior to surgery," which was consistent with "[m]edical literature [that] established a higher rate of complications associated with orthopedic surgeries in obese patients." [*Id.*]. Furthermore, imagine as of April 2022 "showed no further narrowing of the existing bone space, which meant [Lane's] arthritis had not progressed." [*Id.* ¶ 23]. Follow-up imaging confirmed that Lane's arthritis and bone space had not worsened. [*Id.*].

24.     In continuing Lane on non-surgical care, Dr. Henceroth also took into consideration that many observers saw Lane walking without difficulty. [*Id.* ¶ 24]. And while Lane indicated that he "wanted to have his surgery before he was to go home," Dr. Henceroth noted that patient preference of that nature is "never an indication for major knee surgery." [*Id.*]. Upon reviewing Lane's records, including the results from his June 2021 MRI, Dr. Henceroth concluded, "it is my opinion to a reasonable degree of medical probability, that this eight-month time interval did not worsen Mr. Lane's condition and did not change the outcome or prognosis." [*Id.* ¶ 13].

25.     Dr. Henceroth also notes that Lane's medical records indicate that "he refused orthopedic treatment on February 15, 2023, and he refused knee surgery on March 17, 2023." [*Id.* ¶ 19]. [6]

26.     On May 24, 2022, Plaintiff mailed his original complaint to this Court. [Doc. No. 1-2].

27.     In July 2022, Plaintiff requested a cane to "take pressure off [his] knee," [Doc. No. 12 at 19], which he received in August 2022, [*Id.* at 8].

**B.  Dr. Llanes**

28.     Since July 2019, Dr. Llanes has served as the Chief Medical Director of Armor, a private company that provides health care services to correctional facilities. [Doc. No. 36-1 ¶ 3].

29.     As Chief Medical Director of Armor, Dr. Llanes's role was purely administrative. [*Id.* ¶ 5]. He oversaw requests from Armor facility medical providers for outpatient and specialist referrals for inmate patients and worked with the Virginia Armor Regional Medical Director. [*Id.*]. He did not interact with patients or provide on-site, clinical care. [*Id.*].

---

[6] Lane does not dispute that he refused such treatment and knee surgery.

30.     An Armor medical provider submits requests on behalf of inmate patients for outpatient and/or specialist referrals or services through the Arista platform. [*Id.* ¶ 6]. The Arista platform presents the request to a reviewer, which may be the site medical director, the regional medical director, the Chief Medical Officer, or Dr. Llanes. [*Id.*]. The reviewer determines whether the request contains the necessary support, such as "diagnoses, symptoms, previous diagnostic testing and/or imaging, and progress notes from prior consultants," before sending it to the prospective consultant. [*Id.*]. If the request is complete and properly supported, the reviewer approves it; if not, the reviewer denies the request and asks for additional information. [*Id.*].

31.     At all relevant times, Armor provided services at Lunenburg. [*Id.* ¶ 7]. During the relevant times, Dr. Llanes did not (and still does not) have access to patient medical records. [*Id.*].

32.     On October 15, 2020, Dr. Fontaine submitted a request for an MRI of Lane's left knee which stated that Lane had been "seen and evaluated by ortho." [*Id.* ¶ 9]. Dr. Llanes's affidavit notes that the request did not identify a possible diagnosis, did not reference Lane's symptoms or complaints, failed to include any details from the orthopedist's examination, and failed to include the results from diagnostic tests such as x-rays. [*Id.*]. Because "[a] radiologist who receives a request for an MRI without a clinical indication and without results from prior studies and/or orthopedist consultations cannot accurately interpret the MRI[,] … no diagnostic center will accept orders for imaging without a diagnosis." [*Id.* ¶ 10].

33.     Accordingly, Dr. Llanes denied Dr. Fontaine's October 15, 2020 request for an MRI because it did not contain sufficient information. [*Id.* ¶ 11]. Dr. Llanes returned the request to Dr. Fontaine and asked that she resubmit it with the inclusion of a diagnosis and/or the results from prior x-rays or orthopedist consultations. [*Id.*]. Dr. Fontaine never resubmitted a request for an MRI. [*Id.* ¶ 13]. Dr. Llanes explains that Dr. Taslimi or the regional medical director could have

10

approved a resubmitted request any time between October 2020 and May 2021 without involving Dr. Llanes, as evidenced by Dr. Taslimi's subsequent approval of his own request on May 19, 2021 for an on-site visit with Dr. Henceroth. [*Id.* ¶¶ 13-14].

34.     During October 2020, at the height of the COVID-19 pandemic, Lunenburg followed Virginia Department of Corrections and Centers for Disease Control guidance, which suspended the transfer of inmate patients except for medical emergencies. [*Id.* ¶ 12]. Meanwhile, MRI diagnostic centers—especially those in rural communities such as Victoria, Virginia— routinely denied MRI requests that were not medically urgent. [*Id.*]. Indeed, many of those facilities were closed during the lockdowns. [*Id.*].

35.     As mentioned above, on May 19, 2021, Dr. Taslimi entered and approved his own request for an on-site visit with Dr. Henceroth. [*Id.* ¶ 13].

36.     On May 28, 2021, Dr. Taslimi submitted an MRI request for Lane to rule out a torn lateral meniscus. Dr. Llanes approved the request the same day. [*Id.* ¶ 14]. On June 23, 2021, Dr. Llanes approved another request from Dr. Taslimi for Lane to be evaluated at Ortho Virginia. [*Id.*].

37.     The VDOC lifted the COVID-19 shut-down and reopened correctional facilities in Summer 2021. [*Id.* ¶ 15].

38.     Dr. Llanes "did not know [Lane] was experiencing pain, much less 'chronic' or 'substantial' pain that affected his daily activities," and he knew "nothing about his clinical condition," which is in part why Dr. Llanes denied the request for an MRI.[7] In his affidavit, Dr. Llanes opined that knee pain is not a medical emergency. [*Id.* ¶ 16].

---

[7] Lane argues in an unsworn pleading that Dr. Llanes knew the request for an MRI was "serious" because "any time a doctor asks for a[n] inmate to get a[n] MRI it's something serious." [Doc. No. 59 at 2]. Accordingly, Lane claims that Dr. Llanes's denial of the MRI request is the cause of Lane's weight gain and needing to use a cane. [*Id.* at 3]. The amended complaint also alleges that Dr. Llanes "knew the pain that [Lane] was in"; "ignored obvious conditions"; "fail[ed] to provide" and "delayed" treatment; based his decisions on "non-medical factors"; and "knew that a doctor diagnosed [Lane] with a serious medical condition." [Doc. No. 11 at 5]. Lane has not, however, submitted any evidence into the summary judgment record to establish any of these conclusory assertions. Plaintiff's assumptions

## II. LEGAL STANDARD

To survive a motion for summary judgment on an Eighth Amendment claim, a plaintiff must demonstrate that: (1) objectively, the deprivation or harm was "sufficiently serious," and (2) subjectively, the "prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see also Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008).

The subjective prong requires the plaintiff to demonstrate the defendant acted with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying
> an inmate humane conditions of confinement unless the official knows of and

---

regarding Dr. Llanes's knowledge, unsubstantiated by evidence in the record, do not create a genuine issue of material fact. *See Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (observing that a nonmoving party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another") (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Moreover, Plaintiff's conclusory statements regarding his opinions of the adequacy of his medical treatment do not establish that he is competent to testify regarding medical matters. *See Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (holding that a prisoner "[w]holly lacking in medical knowledge" may not give expert medical testimony).

Rather, the summary judgment record establishes that Dr. Llanes knew only what was submitted on the MRI request form. The chief complaint listed in the form provided to Dr. Llanes stated, "Other - MRI of L. knee," and the reason for the MRI request was "[patient] seen and evaluated by ortho. Requesting MRI of the L. knee." [Doc. No. 36-2 at 2]. There is no dispute of fact in the summary judgment record as to Dr. Llanes's averments that he did not know Lane was in pain or anything about his clinical condition. Indeed, in his reply, Lane states that Dr. Llanes did "not know what [the other doctors] where [sic] thinking, or what they would do, or what they thought." [Doc. No. 59 at 2–3]. In that regard, Lane's argument corroborates Dr. Llanes's affidavit and his reasons for denying the October 15, 2020 request—that the request did not provide Dr. Llanes the necessary information to determine if the request should be approved. To be sure, the request did not state that Lane was in pain or include a diagnosis; it only indicated that Lane had been seen by an orthopedist and that the requesting doctor sought approval for an MRI of Lane's left knee. *See* [Doc. No. 36-2 at 2].

> disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see also Rich v. Bruce*, 129 F.3d 336, 340 (4th Cir. 1997). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2). In evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to treatment that is medically necessary, not "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Furthermore, absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

Importantly, as noted, to state a cause of action under § 1983, a plaintiff must allege facts indicating that he was deprived of rights guaranteed by the Constitution or laws of the United States and that the alleged deprivation resulted from conduct committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Barren v. Harrington*, 152 F.3d

1193, 1194 (9th Cir. 1998) ("A plaintiff must allege facts, not simply conclusions, that show that

an individual was personally involved in the deprivation of his civil rights.").

## III. ANALYSIS

### A. Dr. Llanes

Dr. Llanes argues in his motion for summary judgment that, in his administrative position

as Armor's Chief Medical Director, he was not personally involved in providing medical care to

Lane and that his role was limited to reviewing and approving or denying requests by doctors for

consultations or off-site medical services. [Doc. No. 36 at 9–10]. Dr. Llanes denied the October

15, 2020 request for an MRI because the request was not accompanied by supporting

documentation and necessary medical information. [*Id.* at 10]. The amended complaint makes

several conclusory allegations, *see, e.g.*, [Doc. No. 11 at 5] (alleging that Dr. Llanes "ignored the

risk to [Lane's] health and safety"), but the summary judgment record, as described above,

establishes that Dr. Llanes was not personally involved in treating Lane's knee or that Dr. Llanes

knew anything about Lane's condition when he denied the October 15, 2020 request for an MRI

of Lane's left knee. Moreover, the record establishes that Dr. Llanes not only asked the requesting

doctor to resubmit the request with the necessary information, which was not done, but that Dr.

Llanes approved a later request for off-site evaluation of Lane's left knee when the request had

sufficient information. *See* [Doc. No. 36-1] ¶ 14 (explaining that Dr. Llanes "approved [Dr.

Taslimi's May 28, 2021 request for radiology imaging] the same day," and "approved another

request from Dr. Taslimi for the patient to be evaluated by orthopedic surgeons at Ortho Virginia").

A "supervising physicia[n] can be held personally liable under § 1983 only 'when the

supervisor is personally involved in the violation or when the supervisor's corrective inaction

constitutes deliberate indifference towards the violation.'" *Buckley v. Hennepin Cty.*, 9 F.4th 757,

765 (8th Cir. 2021) (quoting *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)).[8] Lane has not established that Dr. Llanes was personally involved in the alleged denial of care for his knee, or that he was deliberately indifferent to a serious medical need.

Lane's reply argues that the word "urgent" on the October 15, 2020 request submitted by Dr. Fontaine satisfies his burden that Dr. Llanes's failure to approve the request is deliberate indifference, and that Dr. Llanes "ignored" Dr. Fontaines characterization of his need for an MRI as "urgent" and also failed to investigate his condition—which delayed and interfered with his medical treatment. [Doc. No. 53-1 at 3–6].[9] Dr. Llanes's role with respect to the October 15, 2020 request for the MRI was administrative. He denied the request for an MRI, which contained no information about Lane's condition or diagnosis, and requested that the submitting physician cure the deficiency by resubmitting the request with the missing information.

In addition, the relevant records refute any allegation of indifference by Dr. Llanes. On October 15, 2020, at 6:01 p.m., Dr. Fontaine submitted the MRI request, rating it as "urgent." [Doc. No. 36-2 at 2]. Approximately one hour later, at 7:00 p.m., Dr. Llanes denied the request because "[t]here [we]re no x-rays, consults, diagnosis or any pertinent medical information provided to assess medical necessity." [*Id.* at 3]; [Doc. No. 36-1 ¶ 9]. There is no indication that any records were ever provided to Dr. Llanes in response to his basis for denying Dr. Fontaine's request, and Dr. Llanes did not have access to those records. *See* [Doc. No. 36-1 ¶¶ 7, 15]. Approximately seven months later, on May 28, 2021, at 11:29 a.m., Dr. Taslimi submitted a

---

[8] Specifically, "Section 1983 liability on the part of the supervisory defendants requires a showing that: (1) the supervisory defendants failed promptly to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994).
[9] Lane failed to file his unsworn response to Dr. Llanes's motion for summary judgment with the Court. Dr. Llanes attached a copy of the response to his reply to Lane's response. *See* [Doc. No. 53-1]. The Court has reviewed the response and acknowledges defense counsel's candor and conscientiousness.

request for an MRI of Lane's left knee, rating it as "routine." [Doc. No. 36-2 at 5]. Importantly, the request included information stating a diagnosis (that Lane had "a case of severe arthritis of left knee") and that the MRI was needed to determine whether Lane had a "torn lateral meniscus," and to "determine if [Lane] need[ed] arthroscopy or is heading to TKR [total knee replacement]." [*Id.* at 6]. The same day at 12:57 p.m., Dr. Llanes approved the request, and the MRI was scheduled for June 9, 2021. [*Id.* at 5]. The MRI was completed and Dr. Taslimi requested and approved a referral to Dr. Henceroth to go over the MRI results with Lane at 8:51 a.m. on June 17, 2021. [*Id.* at 7].[10] On June 23, 2021, at 4:21 p.m., Dr. Taslimi, based upon Dr. Henceroth's recommendation, requested that Lane be seen off-site by Ortho Virginia to be evaluated for surgery. [*Id.* at 8]. Dr. Llanes approved the request that day at 5:04 p.m. [*Id.*].

Contrary to Lane's argument, without any access to Lane's medical records, Dr. Llanes's only means of "investigating" Lane's condition regarding the denial of the October 15, 2020 request was to ask Dr. Fontaine to provide additional information, which he did. [Doc. No. 36-2 ¶ 11].[11] Indeed, the record does not establish that the October 15, 2020 request was "urgent." The medical records Lane submitted establish that he saw Dr. Fontaine on October 21, 2020, six days

---

[10] As the site Medical Director at Lunenburg, Dr. Taslimi had the authority to approve his own request for an on-site referral. *See* [Doc. No 36-1 ¶ 13]. Further, unlike Dr. Llanes, Dr. Taslimi had access to Lane's medical records and noted on the approved request form that the basis for the referral was the completed MRI and the details were in Lane's chart. [Doc. No. 17 at 11].

[11] To the extent Lane alleges that Dr. Llanes failed to address his allegations of pain, the records Lane submitted establish that Dr. Fontaine and attending nurses were managing Lane's left knee pain during the time preceding the October 15, 2020 request and after. Lane was prescribed Motrin and a knee sleeve in May 2020. On May 28, 2020, Lane, wearing the knee sleeve, told Dr. Fontaine that the Motrin had "helped [his] pain," and that the knee sleeve had also "helped," and she continued the Motrin and knee sleeve. [Doc. No. 17 at 39]. In July 2020, Dr. Fontaine offered Lane a cane, which he refused, and switched him from Motrin to Mobic and capsaicin cream because Lane said the Motrin was not working, [*id.* at 42–43]; and in August 2020, Dr. Henceroth administered a cortisone shot. [Doc. No. 48-1 ¶ 8]. Plaintiff next saw Dr. Fontaine on October 21, 2020, and he "agreed to wait until after he goes up for parole to do the MRI [and that] [i]f he makes parole it will not be done." [Doc. No. 17 at 37]. Dr. Fontaine authorized a knee sleeve for pain. [*Id.*]. On January 8, 2021, Lane saw a nurse for his left knee, wanted to "discuss" an MRI for his knee, and indicated that the Motrin had "help[ed] a lot," and "[w]ondered if a cortisone shot would help him." [*Id.* at 33]. On January 14, 2021, he was prescribed Ibuprofen/800 mg. [*Id.* at 34]. The June 30, 2021 entry in Lane's chart states that "Motrin was helpful when [Lane] takes it," and his Motrin prescription was renewed for "90 days." [*Id.* at 26]. Motrin is a brand name for Ibuprofen.

16

after the MRI was denied by Dr. Llanes, and told Dr. Fontaine that he "agreed to wait until after

he goes up for parole to do the MRI [and that] [i]f he makes parole it will not be done." [Doc. No.

17 at 37].

In addition to the records, Dr. Llanes averred in his affidavit that, based on his experience

as an internal medicine physician for 37 years, during which he interacted with countless

radiologists and referred hundreds of patients for imaging, any radiologist who receives a request

for an MRI without a clinical indication and without results from prior studies and/or orthopedist

consultations will not accept those orders. [Doc. No. 53-2 ¶ 4]. Dr. Llanes's experience in such

matters includes radiologists at large academic institutions like MCV and VCU, as well as local

hospitals and standalone imaging centers. [*Id.*]. He further avers that without a diagnosis, no

provider—including those at hospitals—can provide any radiology test for several different

reasons, which include the requirement of an ICD10 Diagnosis Code for diagnostic and billing

purposes. [*Id.*].[12] Lane offers no evidence to the contrary. Further, Dr. Llanes opined that knee

pain is "not a medical emergency," and that surgery for knee pain is "elective." [Doc. No. 36-1 ¶

16].[13] Dr. Henceroth also opined that the surgery was "an *elective* procedure." [Doc. No. 48-1 ¶

22].[14] Dr. Llanes's motion for summary judgement will be granted.

---

[12] The International Classification of Diseases, Tenth Revision (ICD-10) was authored by the World Health Organization (WHO).

> One of the most significant benefits of ICD-10 is its ability to provide accurate and complete information to providers. ICD-10 codes indicate laterality, stage of care, specific diagnosis, and specific anatomy, which creates a more accurate picture of the patient's condition. That allows the provider to allocate proper care and resources, eventually providing better outcomes.

> Accurate documentation of a patient's diagnosis leads to a better healthcare experience and is helpful for the other providers who will later access the patient's health records. It also means improved patient safety and fewer requests for documentation by payers to support diagnoses.

Janna Vienca Cañezal, *What Is ICD-10 & Why Are ICD-10 Codes So Important for Healthcare?*, MEDITAB, https://blogs.meditab.com/what-are-icd-10-codes (last visited July 16 2024).

[13] Relatedly, Dr. Taslimi described the May 28, 2021 MRI request as "routine." [Doc. No. 36-2 at 5].

[14] Again, Lane's own actions negate any assertion that his knee presented an emergency. First, on October 21, 2020, just six days after Dr. Llanes denied the request for an MRI, Lane told Dr. Fontaine that he "agreed to wait until after

**B. Dr. Henceroth**

Lane alleges Dr. Henceroth was deliberately indifferent to his serious medical need, his left knee, and the associated pain. [Doc. No. 11 at 13]. Specifically, he alleges Dr. Henceroth failed to provide "treatment for diagnosed conditions," "delayed [Lane's] treatment," and made "medical decisions based on non-medical factors." [*Id.*]. Lane's allegations attribute authority to Dr. Henceroth that he did not possess. Dr. Henceroth explains in his affidavit in support of his motion for summary judgment that he did not work for Armor; rather, he was a consultant who examined inmates on two or three days each week, lacked the authority to send Lane off-site for an MRI or surgery, and provided his findings and treatment recommendations to the facility physician. [Doc. No. 48-1 ¶¶ 3, 6, 10]. If his recommendation was approved, the facility physician submitted the request electronically on the Arista platform, which presented the request to the reviewers. [*Id.* ¶ 10]. The reviewers ensured the request was appropriate to send to the prospective consultant. [*Id.*]. If the request was properly supported and complete, the reviewer approved it; if not, the reviewer denied the request and asked for additional information. [*Id.*]. The summary judgment record supports Dr. Henceroth's arguments and establishes that Dr. Henceroth was not deliberately indifferent in providing medical care to Lane—rather, he administered pain injections, recommended MRIs and other imaging, and examined him on several occasions when he was referred to him. *See, e.g.*, [*Id.* ¶ 20]. Dr. Henceroth also argues that the delay in his MRI did not result in a worsening of Lane's condition. [*Id.* ¶ 13].

---

he goes up for parole to do the MRI [and that] [i]f he makes parole it will not be done." [Doc. No. 17 at 37]. Second, Lane refused orthopedic treatment on February 15, 2023, and he refused knee surgery on March 17, 2023. [Doc. No. 48-1 ¶ 19]. *See Nelson v. Rodas*, No. 01-cv-07887, 2002 WL 31075804, at *16 (S.D.N.Y. Sept. 17, 2002) (finding that, in the Eighth Amendment context, a plaintiff's refusal to accept treatment "effectively rebuts his claim of deliberate indifference to serious medical needs").

The record establishes that Dr. Henceroth had no control over the approval or scheduling of the MRI. In short, he had no authority to order Lane to be transported to any facility to have an MRI done. He saw Lane on August 25, 2020, reviewed Lane's medical record, and examined Lane and his left knee. [*Id.* ¶ 7]. He diagnosed Lane as "having a sprain of the lateral head of the gastrocnemius with moderate medial compartment arthritis," and injected Lane's "left knee with Kenalog and xylocaine for pain relief and ordered a follow-up appointment for four to six weeks." [*Id.* ¶ 8]. He saw Lane again on October 15, 2020 because of continued complaints regarding the left knee "and recommended an MRI to look for a tear of the lateral meniscus," which "is present in 90% of arthritic knees." [*Id.* ¶ 9]. Such recommendations are typically not "urgent." [*Id.* ¶ 11]. Dr. Henceroth did not know the request had been denied or why it was denied and did not see Lane again until May 28, 2021. [*Id.* ¶¶ 11, 14].

On May 28, 2021, Dr. Henceroth reviewed Lane's medical records and noted that Lane had seen other healthcare staff members numerous times between October 15, 2020 and May 28, 2021. [*Id.* ¶ 14]. He reviewed Lane's prior x-rays, which showed moderate to severe medial compartment arthritis, diagnosed Lane as having moderate to severe compartment arthritis of the left knee, effusion, and obesity, and "recommended an MRI to evaluate the severity of the arthritis and to rule out a torn lateral meniscus." [*Id.* ¶ 15]. The MRI of Lane's left knee was done on June 9, 2021, which "showed advanced tricompartmental chondrosis (cartilage breakdown) and a torn medial meniscus," and Lane was subsequently referred to Dr. Dalton at OrthoVirginia for evaluation. [*Id.* ¶ 16].

Dr. Henceroth saw Lane again on April 11, 2022, examined Lane's left knee and recommended x-rays. [*Id.* ¶ 17]. The x-rays were performed on April 26, 2022 and "showed moderate osteoarthritis of the medial compartment on both knees, and no worsening or progression

since the last images." [*Id.*]. The last time Dr. Henceroth saw Lane was on May 11, 2022. He observed that Lane "had periarticular enlargement (a natural increase in joint size over time) compatible with osteoarthritis and he ambulated without difficulty. I recommended that he return in four months if his condition worsened." [*Id.* ¶ 18]. The summary judgment record also establishes the Lane "refused orthopedic treatment on February 15, 2023" and that Lane refused knee surgery on March 17, 2023, [*Id.* ¶ 19]; and that on October 21, 2020 Lane "agreed to wait until after he goes up for parole to do the MRI [and that] [i]f he makes parole it will not be done." [Doc. No. 17 at 37].

Lane's arguments against Dr. Henceroth fail for several reasons. First, Dr. Henceroth did not have the authority to authorize the MRI or surgery. He recommended the MRI in October 2020, after which the request was denied, and recommended it a second time in May 2021, after which the request was approved, and based on the results of that MRI recommended that Lane be evaluated by Ortho Virginia, which was also approved. [Dk. No. 36-2 at 2–3, 5–8]. In that regard, Dr. Henceroth did not act with deliberate indifference. *See, e.g., Lowe v. Davenport*, 442 F. App'x 955, 956 (5th Cir. 2011) ("At most, [the plaintiff] has alleged that he disagrees with the medical treatment he received and that the medical treatment he received was ineffective. This is insufficient to state a viable claim for deliberate indifference to serious medical needs."); *Thayer v. Adams*, 364 F. App'x 883, 891 (5th Cir. 2010) (holding that nurses did not deny plaintiff treatment or ignore his complaints of pain because "they had no authority to prescribe drugs or embark on a different course of treatment"); *see also Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2014) (holding that a physician was not deliberately indifferent in the Eighth Amendment context for following a prison policy he had no authority to ignore); c*f. Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir. 2017) (rejecting "the notion that 'everyone who knows about a

prisoner's problems' will incur § 1983 liability.") (quoting *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)); *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997) (noting that "officials do not act with 'deliberate indifference' if they are helpless to correct the protested conditions").[15]

Second, it is evident from the care provided by Dr. Henceroth that he was not deliberately indifferent to Lane's medical need regarding his knee in that he either treated Lane for pain or had a copy his medical record that included the pain medications that had been described for Lane by the facility physician. *See* [Doc. No. 48-1 ¶¶ 6, 8, 20] (indicating that Dr. Henceroth knew Lane was taking Motrin for knee pain, administered an injection to alleviate the pain, and referred Lane to imaging to evaluate the pain); *Gobert v. Caldwell*, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995)) (explaining that "[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference"). Indeed, when Lane told Dr. Henceroth on May 28, 2021 that the knee injection did not help,[16] the medical record entries included (1) the medications prescribed for Lane by the facility physician for pain, [Doc. No. 17 at 37, 33] (October 21, 2020 and January 8,

---

[15] The Seventh Circuit has rejected the "contention that any public employee who knows (or should know) about a wrong must do something to fix it is just an effort to evade, by indirection, *Monell*'s rule that public employees are responsible for their own misdeeds but not for anyone else's." *Burks*, 555 F.3d at 596. *Burks* also recognized that the division of labor in bureaucracies is important and allows for the efficient performance of tasks.

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.

*Id.* at 595 (citing *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978)).

[16] On September 21, 2020, Lane told a nurse that although he had a "cortisone shot," his left knee was "still hurting [him] just as bad." [Doc. No. 17 at 45].

2021 entries); and (2) that Lane told a nurse in January 2021 that the Motrin had "help[ed] a lot." [*id.* at 33] (January 8, 2021 entry).[17]

Lastly, Dr. Henceroth reviewed Lane's medical record from when he first recommended Lane be referred for an MRI in October 2020 through when the MRI was completed in June 2021 and opined that "to a reasonable degree of medical probability, that this eight-month time interval did not worsen Mr. Lane's condition and did not change the outcome or prognosis." [*Id.* ¶ 13]. Lane has not substantiated that his condition worsened, although he has complained about being in pain. In that regard, the Fourth Circuit has held that "there is no Eighth Amendment violation unless 'the delay results in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (citing *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008)).

Here, the delay in obtaining the approval was due to Dr. Fontaine, the requesting physician for the MRI on October 15, 2020, failing to submit sufficient justification for an MRI.[18] Dr. Llanes listed the deficiencies in the reason for the denial and Dr. Llanes returned the request to Dr. Fontaine with a request that she resubmit it and include a diagnosis and/or the results from prior x-rays or orthopedist consultations. Dr. Fontaine never resubmitted a request for an MRI for Lane, but did discuss it with him on October 21, 2020; and Lane agreed to wait until after he received a decision about parole. [Doc. Nos. 17 at 37; 36-1 ¶¶ 11, 13]. In June 2021, the next time the request for the MRI was submitted, the MRI was approved, and Lane had the MRI and a consultation with

---

[17] Lane had complained to Dr. Fontaine on July 22, 2020 that Motrin was not working, and she prescribed Mobic and a cream in its place. [Doc. No. 17 at 43]. On December 28, 2020, Lane stated to a nurse that he was in pain and that Ibuprofen "helps pain," and he was switched back to Ibuprofen/Motrin. [*Id.* at 38].

[18] After that denial, the delay was also attributable to Lane because on October 21, 2020, he agreed to wait until there was a decision on his parole before seeking an MRI, and he also refused treatment and surgery. *See supra* note 14.

Ortho Virginia. Thereafter, his surgery was placed on hold because it was elective surgery and due to the COVID-19 lockdown.[19] In short, the delay in approval for an MRI was not attributable to Dr. Henceroth, and Lane has not established that his condition worsened because of the delay. Indeed, as noted above, Lane subsequently refused treatment and surgery.

As discussed above, the facility physician and the other medical personnel repeatedly addressed Lane's complaints about pain, and Dr. Henceroth was aware of this fact because each time he met Lane, he reviewed Lane's medical records which establish that Lane was receiving medication for pain. Accordingly, the delay does not establish Dr. Henceroth was deliberately indifferent to Lane's knee pain, and Dr. Henceroth's motion for summary judgment will be granted.

## IV. CONCLUSION

For the reasons outlined above, Defendant Taslimi will be dismissed without prejudice and Defendants Llanes and Henceroth's motions for summary judgment [Doc. Nos. 35, 47, 49] will be granted through an Order that will be issued alongside this Memorandum Opinion.[20]

---

[19] *See, e.g., McGillvary v. Riez,* No. 22-6430, 2023 WL 8066155, at *4 (D.N.J. Nov. 20, 2023) (dismissing a deliberate indifference claim based on delay because the "Defendants monitored the issue and repaired it once external circumstances—the COVID lockdowns—permitted them to do so"); *Cissé v. Mitchell*, No. 22-cv-6071, 2022 U.S. Dist. LEXIS 170094, at *24 (W.D.N.Y. Sep. 20, 2022) (noting that any "delays in medical care due to COVID-19 were undoubtedly out of [the medical provider's] control").

[20] Plaintiff sought injunctive relief in his October 28, 2022 amended complaint in the form of an order to have his "knee fixed." [Doc. No. 11 at 17]. The uncontradicted evidence, however, established that he refused orthopedic treatment on February 15, 2023, and he refused knee surgery on March 17, 2023. [Doc. No. 48-1 ¶ 19]. If Lane still desires to have his "knee fixed," his first step is to simply ask the current medical provider at Lunenburg, who is not before the Court, to be evaluated for surgery on his left knee. Lane may or may not be a suitable candidate for surgery on his left knee, and the Court expresses no opinion on that matter.

Entered this 19th day of August, 2024.

Alexandria, Virginia

/s/

Anthony J. Trenga
Senior United States District Judge